```
1
2
3                    UNITED STATES DISTRICT COURT
4                          DISTRICT OF NEVADA
5                                 * * *
```

| | | |
|---|---|---|
| 6  | UNITED STATES OF AMERICA, | ) |
| 7  |                Plaintiff, | ) |
| 8  | v. | ) 2:06-cr-0021-JCM-LRL |
| 9  | TODD GOOSBY, | ) Motion to Suppress (#17) |
| 10 |                Defendant. | ) |
| 11 | | ) |

## REPORT & RECOMMENDATION

The defendant, Todd Goosby, is under indictment on one count of Felon in Possession of a Firearm, a violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He has filed a Motion to Suppress Physical Evidence and Statements (#17), in which he contends that the rifle the police seized from his apartment on November 2, 2005 should be suppressed as evidence because no exigent circumstances existed that would have justified the officers' warrantless entry into the apartment. Having considered the motion, the government's Response (#20), Goosby's Reply (#21), the testimony of witnesses and the arguments presented by counsel at the hearing on August 2, 2006, Goosby's post-hearing Supplemental Briefing (#27), and the government's post-hearing Response (#28), the court submits this Report and Recommendation.

### THE EVIDENCE

At the hearing the government called two Las Vegas Metropolitan Police Department ("Metro") patrol officers, Albert Beaz and Kevin Ploense, who responded to Goosby's apartment on November 2, 2005. Goosby called two of his neighbors, Wanda Denise Miles and Cottrell Sanders, who lived near Goosby's apartment in the same complex. The testimony

reveals the following factual scenario.

On November 2, 2005, at approximately 9:40 a.m., Metro received a 911 call from an unidentified woman who reported that a man named "Carl Goosey" had a gun at 901 W. McWilliams, Apt. 606, and that children were in the apartment. The caller then either hung up or was disconnected. Based on background noises the 911 operator/dispatcher advised officers in the field that this may be a domestic violence situation. Despite several attempts, the 911 operator was unable to reestablish contact with the female caller.

Officers Beaz and John Word were the first to arrive at Apt. 606. Across the half-open front door was a locked security gate. Security bars were on the windows. Through the half-open front door the officers saw a man kneeling on the floor. It was the defendant Todd Goosby. The officers asked Goosby to unlock the security gate. He slammed the door shut and began yelling obscenities at the officers, saying he "knows how they are." The officers, who couldn't see through the windows because the blinds were shut, told Goosby they simply wanted to know whether everyone in the apartment was safe. They asked the dispatcher to try to contact the female caller, but she had no success. The officers asked Goosby whether there were children in the apartment. He yelled, "No, there's no one here." Neighbors, however, told the officers that two or three young children lived there. Goosby opened a kitchen window adjacent to the front door. The officers told him why they were there, and that they wanted to see whether everything was all right. He told the officers they couldn't come in without a warrant, and kept repeating that he'd done nothing wrong and that the police should go away. When Goosby walked away from the open window, one of the officers reached through the bars and pulled the blinds down, which enabled them to see into the apartment.

At one point Goosby walked into the kitchen and began washing dishes. The officers believed Goosby was acting so bizarrely that he must be under the influence of drugs. At another point two small children emerged from the back bedroom area. By this time the officers had been at the scene for more than fifteen minutes. The officers tried to coax the children to

open the door, but Goosby, in a highly agitated state, yelled, "Don't open that f---ing door," and pulled the children away. One of the officers pointed his taser gun at Goosby to prevent him from following the children to the back bedroom. Other police officers learned that the manager of the apartment complex didn't have a key to Goosby's security gate. The apartment manager told the police, however, that he would drill the lock off the gate so the police could kick in the door. Finally, just as the maintenance man was about to drill the gate, Goosby opened the door. He was immediately placed under arrest for obstructing the police.

The police still had no idea who or where the 911 caller was, or whether that person was dead or injured. Throughout the encounter with Goosby, he was highly agitated and hostile, acting strangely, likely under the influence of drugs, and obviously unable to care for the children. Officer Ploense and another officer entered the apartment (without a warrant and without Goosby's consent) to see whether there were more children and/or a woman on the premises, and to see whether everyone was all right. They looked in only those areas where a person could be found. They found the two children whom they had seen earlier. Officer Ploense looked under the bed and in the closet in the master bedroom to see whether another child might be hiding there. In the closet, leaning against the wall in plain view, was a .22 caliber Remington Sports Master rifle.

According to the testimony of Officers Ploense and Beaz, Ploense left the rifle in the closet, rejoined Beaz on the porch where Goosby was in handcuffs, and said he had found a rifle in the back bedroom. Goosby responded, "You mean the hunting rifle?" The officers testified that the rifle wasn't removed from the closet until a telephonic search warrant was obtained. According to the testimony of Goosby's neighbors, Ms. Miles and Mr. Sanders, one or two officers entered the apartment moments after Goosby was arrested, and shortly thereafter came out with a rifle, and asked, "What's this?" or "Whose is this?" According to Ms. Miles and Mr. Sanders, the officers then took the rifle back into the apartment.

. . .

**DISCUSSION**

Goosby contends that the warrantless entry into his apartment was unreasonable within the meaning of the Fourth Amendment because the police had insufficient cause to believe that an emergency existed that required the immediate assistance of the police. The government contends that Goosby misreads the test in this Circuit for the application of the "emergency aid exception" to the warrant requirement.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967)(footnotes omitted). For example, "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978). "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963)(opinion of Burger, J.). "[I]t would be silly to suggest that the police would commit a tort by entering ... to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur." *Georgia v. Randolph*, 126 S.Ct. 1515, 1525 (2006).

In the Ninth Circuit, the "emergency doctrine provides that if a police officer, while investigating within the scope necessary to respond to an emergency, discovers evidence of illegal activity, that evidence is admissible even if there was not probable cause to believe that such evidence would be found." *United States v. Cervantes*, 219 F.3d 882, 888 (9th Cir. 2000). The court in *Cervantes* articulated the emergency doctrine's requirements as follows:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, approximating probable

4

    cause, to associate the emergency with the area or place to be searched.

*Id.*

Recently in *Brigham City, Utah v. Stuart*, 126 S.Ct. 1943, 1947 (2006), the Supreme Court addressed the question whether "the appropriate Fourth Amendment standard governing warrantless entry by law enforcement in an emergency situation" should take into account the subjective motivation of the officers, *i.e.*, whether entry was made primarily to make an arrest and seize evidence or to save lives and property. The Court stated: "Our cases have repeatedly rejected this approach. An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'" *Id.* at 1948 (*quoting Scott v. United States*, 436 U.S. 128, 138 (1978)(emphasis in original). "[T]he subjective motivations of the individual officers ... ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 397 (1989).

The effect of *Stuart* is to eliminate the subjective prong of *Cervantes'* emergency doctrine, which required that the entry or search "not be primarily motivated by intent to arrest and seize evidence." Hence, in light of *Stuart*, the narrowed *Cervantes* test now requires the following: (1) that the police have an objectively reasonable basis for believing that an emergency is at hand and that the assistance of the police is needed immediately for the protection of life or property; and (2) that there is some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

Goosby contends that "the reasonableness standard, approximating probable cause, as stated in the second prong, likewise applies to the first prong, requiring the police to show something similar to probable cause in proving the existence of the emergency." Supplemental Briefing (#27) at 3, lines 6-8. According to Goosby, in order to justify a warrantless entry on the basis of the emergency doctrine, not only must there be a basis approximating probable cause to associate the emergency with the area the police wish to enter or search, there must also

be quasi probable cause to believe an emergency exists. The court disagrees.

Neither the Circuit Court in *Cervantes* nor the Supreme Court in *Stuart* articulated the reasonableness standard in a way that would support Goosby's reading of the standard. A plain reading of the *Cervantes* standard on its face contradicts Goosby's interpretation.

> (1) The police must have *reasonable grounds* to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.... (3) There must be some reasonable basis, *approximating probable cause*, to associate the emergency with the area or place to be searched.

*Cervantes*, 219 F.3d at 888 (emphasis added). The qualifier "approximating probable cause" clearly relates only to the basis for associating the emergency with the place to be searched. If the court had also intended to require a quasi probable cause standard in determining whether an emergency existed, it easily could have said so. Moreover, as the government notes in its supplemental response (#28), the Supreme Court in *Stuart* required only that the police have an "objectively reasonable basis" for believing that an emergency exists. 126 S.Ct. at 1949. The Court's analysis did not include consideration of a quasi probable cause standard.

In *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006), the court recently addressed the question "whether the risk of personal danger created exigent circumstances" such that a warrantless entry into a residence was reasonable under the Fourth Amendment. In the Tenth Circuit the test for determining the existence of an emergency had been the same three-factor test used by the Ninth Circuit prior to *Stuart*. The facts in *Najar* were virtually identical to those in this case. The court expressly noted that *Stuart* not only rejected the factor relating to the subjective motivations of the officers, it specifically did *not* "require probable cause in this type of exigent circumstances." *Id*. Without addressing "probable cause" considerations, the court found that the officers' entry into the defendant's residence was objectively reasonable under the Fourth Amendment.

The question here, then, is whether at the time they entered Goosby's apartment the officers had an "objectively reasonable basis" for believing that there may be someone in the

apartment who might be injured or worse, and might need help. At the time they entered the apartment, the officers were aware of the following. An unidentified woman had called 911 to report that there was a man (Goosby) with a gun in an apartment in a situation involving possible domestic violence and the presence of children. Before the 911 operator was able to get any more information from her the woman either hung up or was disconnected. The 911 operator was unable to reestablish contact with her. When responding officers arrived at the apartment, Goosby slammed the door behind a locked security gate, would not let them in to see if everything was all right, yelled obscenities at the officers, falsely told them no kids were in the apartment, and generally acted bizarrely as though high on drugs. When two young children emerged from the back of the apartment and the officers asked them to unlock the door, Goosby swore at the children and warned them threateningly not to open the door. Because they were afraid Goosby might harm the children, one of the officers pointed a taser at Goosby through an open window (with security bars on it) to prevent him from following the children to the back of the apartment. It was not until the apartment manager was ready to drill the lock off the security gate that Goosby opened his front door. At that point the police did not know whether the female caller, whom the dispatcher had been unable to reach, or any other children were in the apartment, and if so, what condition they were in. Under these circumstances, which, it must be remembered, were triggered by a 911 call, the court has little difficulty in concluding that at the time they entered the apartment "the officers reasonably believed there existed an immediate need justifying their entry into [Goosby's] home for the purpose of providing emergency aid." *United States v. Najar*, 451 F.3d at 719. Indeed, under the circumstances of this case it would have been unreasonable under the Fourth Amendment to prevent the police from entering the apartment to determine whether anyone was in need of immediate assistance.

. . .

. . .

. . .

**RECOMMENDATION**

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Goosby's Motion to Suppress Physical Evidence and Statements (#17) should be denied.

DATED this 28th day of August, 2006.

_____
**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**